**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO.** |
| | : | |
| **v.** | : | |
| | : | **VIOLATIONS:** |
| **JOSEF KOYSHMAN,** | : | |
| | : | **22 U.S.C. § 2778** |
| **Defendant.** | : | **Arms Export Control Act** |
| | : | |
| | : | **50 U.S.C. §§ 1701-1707** |
| | : | **International Emergency Economic** |
| | : | **Powers Act** |
| | : | |
| | : | **18 U.S.C. § 371** |
| | : | **Conspiracy to Commit Offense** |
| | : | |
| | : | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT**

I, Naomi E. Morrow, being duly sworn, depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I am a Special Agent of the U.S. Department of Commerce, Bureau of Industry and Security ("BIS"), Office of Export Enforcement ("OEE"). I have served in OEE since September 2012. Prior to my current assignment, I was assigned to the Air Force Office of Special Investigations from January 2008 through September 2012. I am assigned to conduct investigations involving the illegal transfer and export from the United States of commodities, information, and services that are regulated by the United States Departments of Commerce, State, and the Treasury. I am empowered by law to investigate and make arrests pursuant to investigations within the United States and outside the United States, consistent with applicable law. While working for OEE, I have conducted and participated in investigations of violations of

federal law, including the unlawful export of controlled U.S.-origin, dual-use commodities and technology, as well as prohibited transactions between U.S. persons and sanctioned countries.

2. As a Special Agent with OEE, I am familiar with the federal laws relating to the unlawful export of controlled U.S.-origin arms, technology, and commodities from the U.S., as specified and regulated by the U.S. Department of Commerce, the U.S. Department of State's Directorate of Defense Trade Control ("DDTC"), and the U.S. Department of the Treasury's Office of Foreign Asset Controls ("OFAC"). I am also familiar with related laws and the interpretation and application of federal laws and federal court procedures. I have assisted in the execution of multiple federal search warrants. I have participated in investigations of violations of U.S. laws relating to the unlawful export of controlled U.S.-origin arms, technology, and commodities restricted for export for reasons of national security, foreign policy, anti-terrorism, and embargoed destinations. As a Special Agent, I have received training related to identifying the techniques, methods, and procedures employed by groups, organizations, companies, corporations, and individuals to export goods and commodities in violation of U.S. export laws. In addition, I have received specific instruction and training in conducting criminal investigations associated with export law violations, which included investigations associated with violations of the Export Administration Regulations, the International Emergency Economic Powers Act, the Arms Export Control Act, and the International Traffic in Arms Regulations.

3. This affidavit is submitted in support of a criminal complaint and arrest warrant, charging JOSEF KOYSHMAN ("KOYSHMAN") with violating the Arms Export Control Act, 22 U.S.C. § 2778 ("AECA"), the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1707 ("IEEPA"), and Conspiracy, 18 U.S.C. § 371.

4. This affidavit is submitted for the limited purpose of establishing probable cause in support of the application for a criminal complaint and arrest warrant. Therefore, I have not included each and every fact learned during the course of this investigation. I have participated in this investigation and am thoroughly familiar with the information contained in this affidavit through personal investigation, review of various documents and records related to this investigation, and information furnished to me by other law enforcement agents and officers, including the Department of Homeland Security, Department of State, and the U.S. Postal Service ("USPS"). Unless specifically indicated, all conversations and statements described in this affidavit are related in substance and in part only.

## STATUTORY FRAMEWORK

### *Arms Export Control Act*

5. The United States Arms Export Control Act, Title 22, United States Code, Section 2778 authorizes the President to control the export of defense articles and services from the United States. The AECA requires every person engaged in the business of exporting defense articles from the United States to obtain a license or other approval from the Department of State. 22 U.S.C. § 2778(b)(1)(A)(I). The regulations promulgated pursuant to the Act, known as the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120-13, define exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner . . . ." *See* 22 C.F.R. § 120.17. Moreover, the DDTC maintains records of companies and individuals who have registered with the DDTC and applied for and received export licenses.

6. The DDTC is located in the District of Columbia.

7. Defense articles that are subject to such licensing requirements are designated on the United States Munitions List ("USML"). Those designations are made by the Department of State with the concurrence of the U.S. Department of Defense. *See* 22 U.S.C. § 2778(a)(1); 22 C.F.R. § 120.2.

8. Unless specifically exempted, the AECA and its attendant regulations, the ITAR, require persons engaged in the export of defense articles to register with the DDTC and to obtain an export license from the DDTC before exporting defense articles from the United States by any means. *See* 22 U.S.C. § 2778(b)(2); 22 C.F.R. §§ 120.1, 120.17.

***The International Emergency Economic Powers Act and the Export Administration Regulations***

9. Under the International Emergency Economic Powers Act, the President of the United States was granted authority to deal with unusual and extraordinary threats to the national security, foreign policy, or economy of the United States. 50 U.S.C. § 1701(a). The President may declare a national emergency under the IEEPA through Executive Orders that have the full force and effect of law. Among other things, the IEEPA empowers the President to issue regulations governing exports from the United States.

10. Pursuant to the IEEPA, on August 17, 2001, the President issued Executive Order 13,222, which declared a national emergency with respect to the unusual and extraordinary threat to the national security, foreign policy, and economy of the United States in light of the expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which lapsed on August 17, 2001. 66 Fed. Reg. 44,025 (Aug. 22, 2001). While in effect, the EAA regulated the export of certain goods, technology, and software from the United States (generally, items with both military and commercial applications, sometimes referred to as "dual-use" items). Pursuant to the provisions of the EAA, BIS promulgated the Export Administration

Regulations ("EAR"), 15 C.F.R. §§ 730-774, which contained restrictions on the export of items outside of the United States, consistent with the policies and provisions of the EAA. *See* 15 C.F.R. § 730.02. In Executive Order 13,222, pursuant to the IEEPA, the President ordered that the EAR's provisions remain in full force and effect despite the expiration of the EAA. Presidents have issued annual Executive Notices extending the national emergency declared in Executive Order 13,222 from the time period covered by that Executive Order through the present. *See, e.g.*, 82 Fed. Reg. 39,005 (Aug. 16, 2017).[1]

11. Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S.-origin items. *See* 15 C.F.R. §§ 734.2-.3. In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.[2] Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end-user, and the end-use. A BIS license may be required not only to export items from the United States, but also to lawfully reexport such items from one country to a new country. *See* 15 C.F.R. § 734.2(b)(4).

12. BIS is headquartered in the District of Columbia.

13. The most sensitive items subject to EAR controls are identified on the Commerce Control List, or "CCL," set forth in Title 15, C.F.R. Part 774, Supplement Number 1. Items

---

[1] On or about August 13, 2018, President Trump signed the National Defense Authorization Act of 2019, which includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018). In part, ECRA provides permanent statutory authority for the EAR. Because the conduct described in this affidavit occurred prior to the National Defense Authorization Act of 2019 being signed, ECRA does not apply.

[2] As used in the EAR, the term "export" is defined to mean, among other things, "[a]n actual shipment or transmission out of the United States, including the sending or taking of an item out of the United States, in any manner." 15 C.F.R. § 734.13(a)(1). The term "reexport" is defined to mean, among other things, "[a]n actual shipment or transmission of an item subject to the EAR from one foreign country to another foreign country, including the sending or taking of an item to or from such countries in any manner." *Id.*

listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which has export control requirements depending on destination, end-use, and end-user. Items categorized under ECCNs require a license for export based on a specific "reason for control." The "reason for control," in turn, determines the countries to which export of an item requires a license.

14. Under the IEEPA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any order, license, regulation, or prohibition issued pursuant to the statute. 50 U.S.C. § 1705(a). Willful violations of the EAR constitute criminal offenses under the IEEPA, and carry a 20-year maximum term of imprisonment and up to a $1,000,000 fine. 50 U.S.C. § 1705(c).

**FACTUAL BASIS ESTABLISHING PROBABLE CAUSE**

15. KOYSHMAN, is a United States citizen living in Las Vegas, Nevada. According to his LinkedIn profile,[3] KOYSHMAN owns and operates LVN AIRSOFT, a Las Vegas, Nevada-based distributor of firearms and firearms components, described as specializing in airsoft sales, repair, parts, and accessories.[4]

16. Co-conspirator 1 ("CC-1") is a Hong Kong national and owner of *http://www.extravaganzaairsoft.com*, an on-line store based in Hong Kong that sells airsoft components. As a result of a joint investigation involving the Department of Homeland Security-Homeland Security Investigations, OEE, USPS, and the Air Force Office of Special Investigations, CC-1 was arrested on October 6, 2016, in Hawaii. The warrant for arrest and

---

[3] LinkedIn is a social networking site designed to allow members to establish and document professional networks.

[4] Airsoft guns are replica weapons used in airsoft sports. They are a special type of low power, smoothbore air guns designed to shoot non-metallic spherical projectiles typically made of plastic or biodegradable resin materials. Airsoft gun power plants have low muzzle energy ratings and the pellets have significantly less penetrative and stopping powers than conventional air guns, and are generally safe for competitive sporting and recreational purposes if proper protective gear is worn.

supporting criminal complaint alleged that CC-1 committed violations of the AECA and 18 U.S.C. § 554.

17. Between July 2016 to October 2016, KOYSHMAN and CC-1 corresponded using e-mail and WhatsApp.[5] The WhatsApp messages between KOYSHMAN and CC-1 were obtained by law enforcement as a result of CC-1's consent to search his property.[6] CC-1 also provided 12 emails with KOYSHMAN to the government. The correspondence detailed CC-1's efforts to purchase U.S.-origin defense articles and dual-use commodities and to export those items to Hong Kong, without the requisite licenses, with KOYSHMAN's assistance.

***The Unlawful Export of PEQs, a Laser Aiming Device, in Violation of the AECA***

18. Communication between KOYSHMAN and CC-1 began on July 28, 2016, with CC-1 asking KOYSHMAN to help him obtain three L3/Insight-brand Ultra High-Power LA-5C/PEQ's (hereinafter, "PEQ"). KOYSHMAN explained to CC-1 that if the PEQ was sold to the general public, then CC-1 should be able to purchase it himself, "[i]f not I can buy for you at additional 10%."

19. On or about July 28, 2016, CC-1 e-mailed KOYSHMAN a link to *https://tnvc.com/shop/l3-insight-ultra-high-power-atpial-la-5cpeq/*, which is the Tactical Night Vision Company's ("TNVC") PEQ product site. According to the TNCV's website, the PEQ is a weapon-mounted system. The TNVC's website describes the PEQ as a compact, self-contained laser-aiming system that features three functions: Visible Aiming Laser, Infrared Aiming Laser, and Infrared Illuminator. The PEQ product site included the following disclaimer as part of its description of the PEQ: "IR lasers are restricted to Law Enforcement and Government sales only

[5] WhatsApp is an encrypted texting application used between mobile phones as an alternative to SMS text messaging. Instead of using a cellular network to send SMS messages to contacts, it uses the Internet to connect to anyone whose phone number is registered in a phone's address book.

[6] CC-1's consent to search included his consent for the U.S. Government to search his WhatsApp conversations, which was done in his presence. The contents of CC-1's phone was downloaded with his consent.

and cannot be sold to civilians…ITAR restrictions apply." The PEQ is a defense article on the USML and cannot be lawfully exported from the United States without a license. After emailing the link, CC-1 messaged KOYSHMAN on WhatsApp asking if it was possible to purchase the PEQs and stating that "[t]he only problem is that you have go call to order, and only law enforcement and military personnel can order it, if it can be solved that would be great . . . " to which KOYSHMAN replied "Ahh . . . then not. It's restricted."

20. On July 29, 2016, via WhatsApp, CC-1 informed KOYSHMAN that he would order three PEQs and have them shipped to KOYSHMAN's home address in Las Vegas, Nevada. KOYSHMAN responded, "K." KOYSHMAN then asked CC-1 "what do you want on the customs paperwork" and suggested "Airsoft Accys." Based upon later communications between KOYSHMAN and CC-1 regarding methods used to disguise the contents of the packages exported to Hong Kong, there is reason to believe that by labeling the PEQs as "Airsoft Accys" on the customs forms, KOYSHMAN and CC-1 intended to conceal the true identity of the content of the packages.

21. On or about August 1, 2016, KOYSHMAN messaged CC-1 via WhatsApp asking: "[what] are the customs rules on hk[7] regarding airsoft items?" CC-1 replied, "No customs rules actually…but i know you cant ship out airsoft items out of the States as well…as the regulations mentioned." KOYSHMAN replied, "[N]o laws regarding kids toys." CC-1 added, "But the 3 PEQ you gonna send is ITAR items." There was no further mention or discussion about the requirement to obtain an export license prior to proceeding with the shipment. The following day, upon learning from KOYSHMAN that the PEQs would be shipped soon, CC-1 told KOYSHMAN that, "i ordered 1 tank top and 1 t-shirt a pint glass and 2 stickers from noveske for disguise." CC-1 added, "After the rest of the payment of the peq are settled, I would

[7] "hk" is believed to be an abbreviation for Hong Kong.

like to give you a share for helping me out." A search of CC-1's e-mail account revealed several e-mails from Noveske LLC ("Noveske"), a firearms and accessories company located in Grants Pass, OR, regarding this order. An order confirmation, e-mailed from Noveske to CC-1 on August 2, 2016, detailed CC-1's purchase of two Noveske stickers, one pint glass, one Noveske tee-shirt, and one tank top valued at $65.50. The shipping address for the Noveske items was listed as: Joe Koyshman, 1501 Cedar Rock LN #202, Las Vegas, Nevada 89128, United States. The billing address was listed as: [CC-1], Blck 3 Flat D 16/F, Broadview Garden, Tsing Yi, Hong Kong SAR China. On August 4, 2016, CC-1 received an order delivery confirmation from Noveske that indicated that this order was delivered.

22. On or about August 8, 2016, CC-1 messaged KOYSHMAN via WhatsApp:

> Joe, here's the situation, I ordered 3 LA5 PEQ15[8] from *Willsoptics.com*, and paid on the 2nd, and he still have not give me any shipment details…and as I used your address as shipping address, and number, can you help me to call him about the shipment…So you just have to tell him that you ordered these PEQs and would like to know when will it be shipped, and the payment is made by a foreign credit card and if he ask if you are going to ship it out of the States, just say no.... and when all of these are over, I guarantee you that you will have a share of 250usd.

23. The following day, via WhatsApp, KOYSHMAN suggested to CC-1 a "test run" shipment, including one PEQ and some of the Noveske items, and CC-1 agreed. CC-1 added, "By the way, do you think it's a good idea to ship half of the noveske items together with one peq for the first test run, and ship the rest of the noveske items for the second one," to which KOYSHMAN replied, "Why not...who the fuck knows who is novesky?"

24. During subsequent e-mail and WhatsApp conversations regarding shipment of the three PEQs from Las Vegas, NV, to Hong Kong, KOYSHMAN suggested to CC-1 that USPS

[8] According to the TNVC's website, *https://tnvc.com/shop*, the L-3/ Insight LA-5C/PEQ is the high power variant of the standard issue AN/PEQ-15 (ATPIAL) Advanced Target/Pointer Illuminator Aiming Laser.

would be a less expensive option than other shipping services. KOYSHMAN further explained to CC-1 that the USPS "don't check shit" and that he knew a lot about this topic because he had been "shipping garbage for over 10 years…mostly to Europe and middle east." On August 26, 2016, CC-1 confirmed in a message to KOYSHMAN that he received the first shipment containing one PEQ. On September 25, 2016, CC-1 messaged KOYSHMAN regarding the remaining two PEQs and requested that he "ship all the peq craps on monday?? With international priority express usps just like last time??"

***The Attempted Unlawful Export of a L-3 EOTech-Brand G33 Magnifier ("G33") in violation of IEEPA***

25. On or about August 12, 2016, while CC-1 and KOYSHMAN were communicating via e-mail and WhatsApp about the three PEQs, CC-1 placed an order for one L-3 EOTech-brand G33 Magnifier ("G33")[9] with OpticsPlanet.com, an Illinois-based on-line retailer of shooting, hunting, military, and law enforcement equipment. According to a technical specification for the G33 found on the EOTech website, "The G33 is controlled under the Export Administration Regulations (EAR) ECCN 0A987, and may not be exported to a foreign person, either in the U.S. or abroad, without a license or exception from the U.S. Department of Commerce." According to the EAR, the reasons for control for ECCN 0A987 include Crime Control. An export of the G33 to Hong Kong would require a license from the BIS. There are no list-based license exceptions available. On August 12, 2016, CC-1 received an e-mail order confirmation for order #5360116 from OpticsPlanet.com. The order included one G33, valued at $549.00. The G33 product page on the EOTech website states that there may be "Government Export Restrictions" on this commodity and that the G33 "may be regulated by the U.S.

[9] According to the EOTech website, *www.eotechinc.com*, the G33 is a weapon-mounted system. The website describes the G33 as a magnifier for a weapons sight that "vastly improves target recognition and increased lethality at medium range distances."

Department of State or the U.S. Department of Commerce." Likewise, the G33 product page on the OpticsPlanet.com website states "Government Export Restriction" and that "[t]his item may be regulated for export by the U.S. Department of State or the U.S. Department of Commerce. Please see our Export Policy prior to placing your order." The shipping address on the e-mail was listed as KOYSHMAN's home address. The billing address was listed as: [CC-1], Block3 Flat D 16/f, Broadview Garden, Hong Kong.

26. On or about August 15, 2016, OpticsPlanet.com e-mailed CC-1 and informed him that his G33 order was on hold because there was an indication that the commodity would be exported outside of the United States. The e-mail to CC-1 stated that prior to shipping the order, OpticsPlanet.com would have to verify that the G33 would not be leaving the United States without valid authorization or an export license issued by the U.S. Government. CC-1 was provided the following questions to answer: (1) Who is the end user of the product(s); you have ordered?; (2) What is the end use of the product(s) you have ordered?; (3) Where is the final destination of the product(s) you have ordered? (Please respond with a city and country) and; (4) Why was your order submitted internationally? CC-1 responded to the e-mail with the following:

> (1) Joe Koyshman; (2) Mounting on Joe's AR-15 with his Eotech; (3) Nevada Las Vegas, America; and (4) Few days ago, we had a bet on the Olympic's Women Beach Volley Ball, the one that America versus China, and of cause Joe bets on the United States, and I have to go for China, and I lost the bet because The United States won the game 2-0, and he started to mentioned the bet which is the Eotech G33 magnifier, he said 'Hey! [Co-conspirator 1]! Man up and get me my magnifier', So I got him one on the optics planet, he did not know that it was discounted though, but he'll find out soon.

27. CC-1 informed KOYSHMAN over WhatsApp of his responses to the four questions. KOYSHMAN acknowledged the cover story and also told CC-1 he should use KOYSHMAN's address for the purchase of the G33 in order to obscure the international nature of the transaction, stating: "Can't you pay. By paypal?...Just put my address in your PayPal."

28. On August 17, 2016, OpticsPlanet.com e-mailed CC-1 and requested that he and KOYSHMAN sign and complete an EAR Compliance Certification and verify that the G33 would not be exported from the United States. On that same day, according to an e-mail from eBay to CC-1, CC-1 purchased from an eBay seller a G33 valued at $459.95. The delivery address on thde e-mail was listed as KOYSHMAN's home address.

29. On or about September 20, 2016, CC-1 sent a message to KOYSHMAN via WhatsApp with a list of commodities that were pending shipment, including the G33.

30. On October 11, 2016, an Inspector with the USPS conducted an interview with the USPS letter carrier who, for several years, serviced the mail route for KOYSHMAN's home address. The interview revealed that KOYSHMAN received approximately four to five parcels a day and a minimum of seven to eight parcels weekly. The return addresses indicated that the parcels had been sent from locations throughout the United States and were often eBay purchases. The USPS letter carrier also stated that, on occasion, the incoming parcels were addressed to someone other than KOYSHMAN.

***Attempted unlawful export of an AN/PRC-152 Handheld Radio and an AN/PVS-31A Binocular Night Vision Googles, in violation of the AECA***

31. Beginning on or about February 28, 2017, all of CC-1's communications with KOYSHMAN were done under the direction and supervision of law enforcement. On that date, CC-1 made contact with KOYSHMAN via WhatsApp, and informed KOYSHMAN that he had been out of business for a few months, but that he was starting to get back into business. On March 1, 2017, CC-1 asked KOYSHMAN, via WhatsApp, if any products had arrived at KOYSHMAN's home address for CC-1 during his absence. KOYSHMAN responded that one rail for a rifle had arrived. CC-1 added that he still needed to order more items, and inquired if

KOYSHMAN would still be able to receive equipment for him at his home address and then ship the items to him in Hong Kong. KOYSHMAN replied, "K…I'll be here."

32. On or about March 3, 2017, CC-1 informed KOYSHMAN, via WhatsApp, that he wanted to place an order for one AN/PRC-152 Handheld Radio and one AN/PVS-31A Night Vision Goggles. However, CC-1 informed KOYSHMAN that the U.S. company wanted CC-1 to complete certain paperwork, commonly known as an end-user statement, affirming that the items would not be exported. CC-1 asked KOYSHMAN to fill out the paperwork and KOYSHMAN agreed. CC-1 told KOYSHMAN that "[t]he print name has to be your name coz i told them it's a gift for you and i pay for it otherwise they wont ship it." KOYSHMAN responded, "Just ship is as is and see what happens. If they will have a problem they will let you know. It can always be revised." CC-1 replied, "But you signed my name as well," to which KOYSHMAN stated, "Roll with it. We have a phrase...it's better to ask for forgiveness then permission."

33. On or about March 3, 2017, CC-1 sent an email to KOYSHMAN referencing their earlier WhatsApp conversation and attaching the incomplete end-user statement. KOYSHMAN responded to CC-1 by email, including an invoice and the completed end-user statement as attachments. The invoice for $9,200, dated March 2, 2017, was for one AN/PRC-152 Handheld Radio and one AN/PVS-31A Night Vision Goggles. The invoice was addressed to KOYSHMAN's home address in Las Vegas. KOYSHMAN completed the end-user statement and identified the purchasing company as LVN AIRSOFT. He added CC-1 as the name of the buyer and signed CC-1's name on the statement. Under the section of the end-user statement titled "Disclosure and Certification of End-User and End-Use," KOYSHMAN hand wrote that the end-use/application was "Props display." The end-user statement included information regarding United States Export Regulations Compliance under the ITAR, the EAR, and with

OFAC. Specifically, the end-use statement stated, "The Company understands that its sale or distribution of said products may constitute exports or re-exports, and as such, must be in accordance with the requirements of the EAR, ITAR, and OFAC."

34. On or about March 6, 2017, a Special Agent with the Department of Homeland Security, Homeland Security Investigations (the "HSI Agent"), called KOYSHMAN at the same telephone number KOYSHMAN regularly used to communicate with CC-1 on WhatsApp. Acting in an undercover capacity as an employee from a U.S. company, the HSI Agent informed KOYSHMAN that he was calling regarding the AN/PRC-152 Handheld Radio and AN/PVS-31A Night Vision Goggles that CC-1 wanted to purchase. The HSI Agent explained that he wanted to confirm with KOYSHMAN that CC-1 was purchasing the equipment for KOYSHMAN as a gift and that the products would remain in the United States. KOYSHMAN confirmed what was asked and that the products would not be exported. The HSI Agent then asked KOYSHMAN if he had seen the end-user statement which had been sent to CC-1, and KOYSHMAN confirmed that he had. KOYSHMAN stated he would not send the products outside of the United States. When asked if he had any questions regarding the end-user statement or the transaction, KOYSHMAN responded that he did not.

35. On or about March 22, 2017, via WhatsApp, KOYSHMAN instructed CC-1 to "[s]end 100 for now." CC-1 responded, "I just sent you 100." PayPal records provided to law enforcement officers by CC-1 show a payment made to KOYSHMAN on March 22, 2017, for $100.00.

36. On or about March 27, 2017, via WhatsApp, CC-1 wrote to KOYSHMAN, "They will ship it on monday to your place and will arrive on wed." On the following day, CC-1, via WhatsApp, provided KOYSHMAN the USPS tracking number for the package containing the

AN/PRC-152 Handheld Radio and AN/PVS-31A Night Vision Goggles. The invoice reflected that the shipment was destined to KOYSHMAN's home address in Las Vegas.[10]

37. On or about March 29, 2017, law enforcement officers placed several documents in a parcel containing the AN/PRC-152 Handheld Radio and AN/PVS-31A Night Vision Goggles, including a copy of the invoice, a copy of the end-user statement, and a document with a destination control statement. This destination control statement reads, in pertinent part: "The contents of this package are subject to export controls administered by the U.S. Government and may require a license to be exported from the United States. Diversion contrary to U.S. law is prohibited." The parcel containing the AN/PRC-152 Handheld Radio and AN/PVS-31A Night Vision Goggles was placed on the doorstep of KOYSHMAN's home address by law enforcement officers. KOYSHMAN was observed picking up the parcel and taking it inside his residence. Shortly thereafter, KOYSHMAN was observed working on his laptop while at his residence. At about the same time, CC-1 reported to law enforcement officers that he received a message from PayPal that stated, "[Y]our package from Josef Koyshman is on its way." KOYSHMAN then informed CC-1, via WhatsApp, that he had created the shipping label for the parcel and that it would be shipped the following day.

38. Law enforcement officers conducted continuous surveillance of KOYSHMAN from the time the package was delivered to his residence on March 29, 2017, until the morning of March 30, 2017. On March 30, 2017, KOYSHMAN was seen leaving his residence with a parcel in his hands. He drove to the USPS mailbox located in his apartment complex but when could not get the parcel to fit in the box, KOYSHMAN proceeded to a nearby grocery store and placed the parcel in a USPS mailbox that was large enough to fit the parcel.

---

[10] The U.S. Government confirmed that the address of 1501 Cedar Rock Lane, #202, Las Vegas, Nevada is associated with KOYSHMAN and is the same address KOYSHMAN provided on the invoice and end-user statement for this transaction. This is also the address CC-1 used as the shipping address for the transaction.

39. The parcel was subsequently recovered by law enforcement officers. The customs declaration affixed to the parcel stated that the package was shipped from LVN Airsoft, 1501 Cedar Rock LN, Unit 202, Las Vegas, Nevada 89128, KOYSHMAN's home address, and addressed to be sent to CC-1, 16/F Flat D Block 3, Broadview Garden, Tsing yi, Hong Kong. The commodities were falsely labeled as a Walkey Talkey (valued at $27.00) and binoculars (valued at $42.00). The customs declaration included the following statement: "I certify the particulars given in this customs declaration are correct. This form does not contain any undeclared dangerous articles, or articles prohibited by legislation or by postal or customs regulations. I have met all applicable export filing requirements under federal law and regulations." KOYSHMAN signed his name under this statement. Law enforcement officers opened the parcel and confirmed that it contained the AN/PRC-152 Handheld Radio and the AN/PVS-31A Night Vision Goggles, but observed that the invoice, the end-user statement, and the export warning were not found inside the parcel.

**U.S. GOVERNMENT COMMODITY AND LICENSE DETERMINATIONS**

40. On or about July 2, 2015, a Commodity Jurisdiction ("CJ") completed by the DDTC classified the AN/PEQ-15 Advanced Target Pointer/Illuminator/Aiming Laser as a defense article listed on the USML in Category XII(e). As such, exporting this item from the United States without having first obtained a license or other written authorization for such export constitutes a violation of 22 U.S.C. §§ 2778(b)(2) and (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1.

41. On or about July 16, 2018, a License Determination completed by the BIS, classified the EOTech G33 Magnifier with Switch-to-Side Mount as ECCN 0A987.e and controlled for export to Hong Kong for Crime Control reasons. As such, exporting this item from

the United States to Hong Kong between January 1, 2016, to January 1, 2018, without having first having obtained a license or other written authorization from the U.S. Government would have constituted a violation of federal law. The License Determination goes on to say that "there are very limited circumstances in which items controlled for Crime Control reasons may be exported or reexported under License Exceptions."

42. On or about October 20, 2016, a CJ completed by the DDTC classified the AN/PRC-152 Handheld Radio as a defense article listed on the USML in Category XI(a)(5). As such, exporting this item from the United States without having first obtained a license or other written authorization for such export constitutes a violation of Title 22 U.S.C. §§ 2778(b)(2) and (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1.

43. On or about September 9, 2016, a CJ completed by the DDTC classified the AN/PVS-31A Binocular Night Vision Device as a defense article listed on the USML in Category XII(c). As such, exporting this item from the United States without having first obtained a license or other written authorization for such export constitutes a violation of 22 U.S.C. §§ 2778(b)(2) and (c), and 22 C.F.R. §§ 121.1, 123.1, and 127.1.

44. A search of the DDTC licensing database in October 2016 revealed that there had been no applications for licenses submitted by, or on behalf of, either KOYSHMAN or CC-1. Therefore, the DDTC had not issued the required licenses to lawfully export the U.S.-origin goods detailed in this affidavit to either KOYSHMAN or CC-1.

45. Furthermore, a search of the BIS licensing database on January 29, 2018, similarly revealed that there had been no applications for licenses submitted by, or on behalf of either KOYSHMAN or CC-1. Therefore, the BIS had not issued the required licenses to lawfully export the U.S.-origin goods detailed in this affidavit to either KOYSHMAN or CC-1.

**CONCLUSION**

46. Based on the facts set forth herein, and on my experience and training in investigating cases involving violations of federal law, I submit there is probable cause to believe that KOYSHMAN has committed the following offenses: the export, or attempted export, of defense articles without a license, in violation of 22 U.S.C. § 2778(b)(2) and (c) (the Arms Export Control Act); 50 U.S.C. §§ 1701 – 1707 (the International Emergency Economic Powers Act); and 18 U.S.C. § 371 (Conspiracy).

Naomi E. Morrow
Special Agent
Office of Export Enforcement
U.S. Department of Commerce

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on the __ day of May, 2019.

THE HONORABLE G. MICHAEL HARVEY
UNITED STATES MAGISTRATE JUDGE