## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**Holding a Criminal Term**
**Grand Jury Sworn in on May 7, 2019**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.:** |
| | : | |
| **v.** | : | **MAGISTRATE NO.:** |
| | : | |
| **JOSEF KOYSHMAN,** | : | **VIOLATIONS:** |
| | : | |
| **Defendant.** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy)** |
| | : | |
| | : | **22 U.S.C. § 2778** |
| | : | **(Arms Export Control Act)** |
| | : | |
| | : | **50 U.S.C. § 1705** |
| | : | **(International Emergency** |
| | : | **Economic Powers Act)** |
| | : | |
| | : | **18 U.S.C. § 981(a)(1)(C)** |
| | : | **28 U.S.C. § 2461** |
| | : | **21 U.S.C. § 853(p)** |
| | : | **(Criminal Forfeiture)** |

## I N D I C T M E N T

The Grand Jury charges that:

## GENERAL ALLEGATIONS

At all times material to this Indictment:

1.      Defendant JOSEF KOYSHMAN ("KOYSHMAN") was a United States citizen, living in  Las Vegas, Nevada.  Defendant KOYSHMAN owned and operated LVN AIRSOFT, a Nevada-based distributor of firearms and firearms components, specializing in airsoft sales, repairs, parts, and accessories.

2.      Co-conspirator 1 ("CC-1") was a Hong Kong national and owner of an on-line store based in Hong Kong that sells airsoft components such as Trijicon-brand rifle optics.

3.      A company located in California, identified herein as the "California Company," manufactured and sold various equipment; including a L-3/Insight Ultra High-Power ATPIAL UHP LA-5C/PEQ, a high-power, self-contained laser-aiming system ("High-Power Advanced Laser-Aiming System").

4.      A company located in Illinois, identified herein as the "Illinois Company," was an-online retailer of various equipment; including a weapon-mounted system, which acts as a magnifier for weapons sight and improves target recognition.  ("G33 Magnifier").

5.      A company located in Oregon, identified herein as the "Oregon Company," manufactured and sold various equipment, including AR-15 rifles, AR-15 rifle components, and military and competition-grade rifle barrels.

6.      A company located in Georgia, identified herein as the "Georgia Company," was an online retailer specializing in night vision equipment for law enforcement and military professionals, including the High-Power Advanced Laser-Aiming System.

7.      A company located in the United States, identified herein as the "U.S. Company," was an online retailer that sold, among other items, AN-PRC152 handheld radios and AN/PVS-31A binocular night vision goggles.

### The Arms Export Control Act

8.      The Arms Export Control Act, Title 22, United States Code, Section 2778 ("AECA") authorized the President to control the export of defense articles and services from the United States.  Unless a specific exception applies, the Act provided that no defense articles or defense services may be exported without a license for such export.  22 U.S.C. § 2778(b).  The

regulations promulgated pursuant to the Act were the International Traffic in Arms Regulations ("ITAR"), Title 22, Code of Federal Regulations, Parts 120 through 130. Section 2778(c) of the AECA established criminal penalties for any willful violation of Section 2778 or any rule or regulation thereunder, including the ITAR.

9.      The United States Department of State's Directorate of Defense Trade Controls (the "DDTC") administered the ITAR and regulated the export of defense articles. Under Section 123.1 of the ITAR, any person who intended to export a defense article had to obtain a license or other written approval from the DDTC before such export occurred. Pursuant to the ITAR, exporting, or attempting to export, a defense article from the United States without a license or other written approval from the DDTC was unlawful. 22 C.F.R. § 120.17. The ITAR defined exporting to include, among other things: "[s]ending or taking a defense article out of the United States in any manner." 22. C.F.R. § 120.17.

10.     Defense articles that were subject to such licensing requirements were designated on the United States Munitions List ("USML"). Those designations were made by the Department of State with the concurrence of the United States Department of Defense. *See* 22 U.S.C. § 2778(a)(1); 22 C.F.R. § 120.2.

11.     A L-3/Insight Ultra High-Power ATPIAL UHP LA-5C/PEQ was listed as a defense article on the USML in Category XII. An AN/PRC-152 Handheld Radio was listed as a defense article on the USML in Category XI(a)(5). AN/PVS-31A Binocular Night Vision Goggles were listed as defense articles on the USML in Category XII(c). Therefore, these items could not and cannot be lawfully exported from the United States without a license or other written approval from the DDTC.

## The International Emergency Economic Powers Act
## And the Executive Orders Issued Thereunder

12.     Under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C.

§§ 1701-1707, the President of the United States was granted authority to deal with unusual and

extraordinary threats to the national security, foreign policy, or economy of the United States. 50

U.S.C. § 1701(a).  Pursuant to that authority, the President may declare a national emergency

through Executive Orders that have the full force and effect of law.  Among other things, IEEPA

empowers the President to issue regulations governing exports from the United States.

13.     Pursuant to IEEPA, on August 17, 2001, the President issued Executive Order

13,222, which declared a national emergency with respect to the unusual and extraordinary threat

to the national security, foreign policy, and economy of the United States in light of the

expiration of the Export Administration Act ("EAA"), 50 App. U.S.C. §§ 2401-2420, which

lapsed on August 17, 2001.  66 Fed. Reg. 44,025 (Aug. 22, 2001).  While in effect, the EAA

regulated the export of goods, technology, and software from the United States.  Pursuant to the

provisions of the EAA, the Department of Commerce's Bureau of Industry and Security ("BIS")

promulgated the Export Administration Regulations ("EAR"), 15 C.F.R. §§ 730-774, which

contained restrictions on the export of goods outside of the United States, consistent with the

policies and provisions of the EAA.  *See* 15 C.F.R. § 730.02.  In Executive Order 13,222,

pursuant to IEEPA, the President ordered that the EAR's provisions remain in full force and

effect despite the expiration of the EAA.  Presidents have issued annual Executive Notices

extending the national emergency declared in Executive Order 13,222 from the time period

covered by that Executive Order through the present.  *See, e.g.*, 83 Fed. Reg. Vol. 83, No. 152

(August 7, 2018). [1]

---

[1] On or about August 13, 2018, President Trump signed the National Defense Authorization Act of 2019, which

14.     Through the EAR, BIS reviews and controls the export from the United States to foreign countries of certain U.S. items.  15 C.F.R. §§ 734.2-.3.  In particular, BIS has placed restrictions on the export and reexport of items that it has determined could make a significant contribution to the military potential or nuclear proliferation of other nations or that could be detrimental to the foreign policy or national security of the United States.  Under the EAR, such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use.  A BIS license may be required not only to export items from the United States, but also to lawfully reexport such items from one country to a new country.  *See* 15 C.F.R. § 734.2(b)(4).

15.     The most sensitive items subject to EAR controls were identified on the Commerce Control List, or "CCL", set forth in Title 15, Code of Federal Regulations, part 774, Supplement Number 1.  Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which had export control requirements depending on destination, end use, and end user.  Items categorized under ECCNs required a license for export based on a specific "reason for control."  The "reason for control," in turn, determined the countries to which export of an item required a license.

16.     Under the EAR, the G33 Magnifier was categorized under ECCN 0A987.e, and it was controlled for Crime Control reasons for export to Hong Kong.  Therefore, this item could not and cannot be lawfully exported from the United States to Hong Kong without a license from BIS.

---

includes provisions on export controls, entitled the Export Control Reform Act of 2018 ("ECRA"), Pub. L. No. 115-232, tit. 17, subtitle B, 132 Stat. 2208 (2018).  In part, ECRA provides permanent statutory authority for the EAR. Because the conduct described in this Indictment occurred prior to the National Defense Authorization Act of 2019 being signed, ECRA does not apply.

**THE CONSPIRACY**

**COUNT ONE**

17.     Beginning in or around July 2016, and continuing through in or around

April 23, 2017, defendant **JOSEF KOYSHMAN** did willfully combine, conspire, and agree with

others known and unknown to the Grand Jury, to:  (a) commit offenses against the United States,

that is, to export and attempt to export U.S.-origin defense articles and dual-use commodities, from

the United States to Hong Kong, without having first obtained the required licenses from DDTC

and BIS, each located in the District of Columbia, in violation of Title 22, United States Code,

Sections 2778(b)(2), (c); and Title 22 Code of Federal Regulations, Parts 121.1, 123.1, 127.1 (a),

(e); and Title 50, United States Code, Section 1705; and (b) defraud the United States Government

by interfering with and obstructing a lawful government function, that is, the enforcement of laws

and regulations prohibiting certain exports to Hong Kong and other countries without having first

obtained the required licenses from DDTC and BIS, by deceit, craft, trickery, and dishonest means,

in violation of Title 18, United States Code, Section 371.

18.     The conduct alleged in this Indictment occurred within the District of Columbia

and elsewhere, and therefore within the venue of the United States District Court for the District

of Columbia pursuant to Title 18, United States Code, Section 3237(a).

**Goals of the Conspiracy**

19.     The goals of the conspiracy were:

    a.     to make money and profits;

    b.     to export U.S.-origin defense articles and dual-use commodities;

    c.     to evade the prohibitions and licensing requirements of AECA and IEEPA;

        and

d.       to conceal the prohibited transactions from detection by the United States

government so as to avoid penalties.

## Manner and Means of the Conspiracy

20.      The conspirators would and did use the following manner and means, among

others, to accomplish the objects of the conspiracy:

a.       CC-1, residing in Hong Kong, ordered various items listed on the USML,

as well as dual-use commodities regulated through the EAR, and had them shipped to

KOYSHMAN's home address in Las Vegas, Nevada.

b.       KOYSHMAN shipped these export-controlled items from Las Vegas,

Nevada, to CC-1 in Hong Kong and provided false information on the required customs

paperwork in order to conceal the true nature of the contents of the shipments.

c.       Defendant KOYSHMAN and CC-1 did not obtain the required licenses

from the federal government to export from the United States to Hong Kong the U.S.-origin

defense articles and the dual-use commodities.

## Overt Acts

21.      In furtherance of the above-described conspiracy, and in order to carry out the

objects thereof, defendant KOYSHMAN and others, known and unknown to the Grand Jury,

committed or caused to be committed, in the District of Columbia and elsewhere, the following

overt acts, among others:

### The Exportation of High-Power Advanced Laser-Aiming Systems

a.       On or about July 29, 2016, CC-1 sent a message to KOYSHMAN that

contained a link to the California Company's product site.

b.     On or about July 29, 2016, CC-1 sent a message to KOYSHMAN, informing KOYSHMAN that CC-1 would order three High-Power Advanced Laser-Aiming Systems and have them shipped to KOYSHMAN's home address in Las Vegas, Nevada.

c.     Between July 29, 2016 and August 1, 2016, CC-1 and KOYSHMAN exchanged messages in which KOYSHMAN agreed to receive items purchased by CC-1, repackage those items, and ship them from Las Vegas, Nevada, to Hong Kong.

d.     On or about August 2, 2016, CC-1 sent KOYSHMAN a message, informing KOYSHMAN that CC-1 ordered additional, innocuous items from the Oregon Company, in an effort to disguise and conceal the High-Power Advanced Laser-Aiming Systems that KOYSHMAN would ship from Nevada to CC-1 in Hong Kong.

e.     On or about August 6, 2016, CC-1 and KOYSHMAN exchanged messages in which CC-1 informed KOYSHMAN that CC-1 ordered three High-Power Advanced Laser-Aiming Systems from the Georgia Company and paid for the items. CC-1 asked KOYSHMAN to call the Georgia Company in order to obtain details regarding the shipment.

f.     On or about August 9, 2016, KOYSHMAN suggested to CC-1 that they conduct a "test run" shipment, in which one of the High-Power Advanced Laser-Aiming Systems would be shipped to CC-1 in Hong Kong along with the innocuous commodities.

g.     On or about and between August 9, 2016 and August 26, 2016, KOYSHMAN and CC-1 discussed the shipment of the High-Power Advanced Laser-Aiming System to Hong Kong. KOYSHMAN indicated that USPS did not thoroughly screen outgoing shipments.

8

       h.      On or about August 26, 2016, CC-1 sent KOYSHMAN a message,

informing KOYSHMAN that CC-1 received the first shipment containing one of the three High-

Power Advanced Laser-Aiming Systems.

       i.      On or about September 25, 2016, CC-1 sent KOYSHMAN a message,

asking that KOYSHMAN ship the remaining High-Power Advanced Laser-Aiming Systems the

following Monday.

### The Attempted Export of a G33 Magnifier

       j.      On or about August 12, 2016, CC-1 placed an order for a G33 Magnifier

and directed that the item be shipped to KOYSHMAN's home address.

       k.      On or about August 15, 2016, the Illinois Company sent CC-1 an email,

informing CC-1 that the order for the G33 Magnifier was on hold because there was an

indication that the commodity might be exported outside the United States.

       l.      On or about August 17, 2016, in response to questions posed by the

Illinois Company, CC-1 listed KOYSHMAN as the end user of the product, and listed the final

destination for the product as Las Vegas, Nevada.

       m.      On or about August 16, 2016, CC-1 sent KOYSHMAN a message,

informing KOYSHMAN of CC-1's communications with the Illinois Company. KOYSHMAN

suggested that CC-1 pay for the item using Paypal, and further directed CC-1 to list

KOYSHMAN's home address in Las Vegas, Nevada, as the address associated with CC-1's

Paypal account.

       n.      On or about September 20, 2016, CC-1 sent a message to KOYSHMAN

that contained a list of commodities that were pending shipment to KOYSHMAN's home

address, including the G33 Magnifier.

### The Attempted Export of an AN/PRC-152 Handheld Radio
### and AN/PVS-31A Binocular Night Vision Goggles

o.      On or about March 3, 2017, CC-1 sent a message to KOYSHMAN,

informing KOYSHMAN that CC-1 wanted to place an order for one AN/PRC-152 Handheld

Radio and one AN/PVS-31A Binocular Night Vision Goggles.

p.      On or about March 3, 2017, CC-1 asked KOYSHMAN to fill out

paperwork required by the U.S. Company, affirming that the items would be not exported from

the United States.

q.      On or about March 3, 2017, CC-1 sent an email to KOYSHMAN with the

required paperwork attached. KOYSHMAN responded to CC-1 by email, attaching an invoice

and the completed paperwork. KOYSHMAN's home address was listed on the invoice, and

KOYSHMAN signed CC-1's name, affirming that the items would remain in the United States.

r.      On or about March 3, 2017, CC-1 sent a message to KOYSHMAN about

the shipping paperwork. CC-1 stated, "But you signed my name as well." KOYSHMAN

responded, "Roll with it," and added, "it's better to ask for forgiveness then [sic] permission."

s.      On or about March 22, 2017, KOYSHMAN instructed CC-1 to send him

$100 via Paypal as payment for his services.

t.      On or about March 29, 2017, a parcel containing the AN/PRC-152

Handheld Radio and AN/PVS-31A Binocular Night Vision Goggles was placed on the doorstep

at KOYSHMAN's home address.

u.      On or about March 30, 2017, KOYSHMAN placed the parcel in a USPS

Mailbox located in Las Vegas, Nevada. Affixed to the parcel was a customs declaration,

indicating that the package was being shipped from KOYSHMAN's home address to CC-1 in

Hong Kong. The commodities were falsely labelled as a "Walkey talky" and "binoculars" on the

10

customs declaration.

(**Conspiracy to Unlawfully Export U.S.-origin Defense Articles and Dual-Use Commodities, From the United States to Hong Kong**, in violation of Title 22, United States Code, Sections 2778(b)(2), (c); Title 22, Code of Federal Regulations, Parts 121.1, 123.1, 127.1 (a), (e); and Title 50, United States Code, Section 1705).

## COUNTS TWO through THREE

22.    The Grand Jury re-alleges Paragraphs 1 through 21 of Count One of this Indictment as if fully set forth herein.

23.    Beginning in or around July 2016, and continuing through in or around April 23, 2017, within the District of Columbia and elsewhere, defendant **JOSEF KOYSHMAN**, and others known and unknown to the Grand Jury, did willfully export, attempt to export, and attempt to cause the export, from the United States to Hong Kong, the items listed in the Counts below, all of which were and are designated as defense articles on the USML, the export of which was and is controlled under the Arms Export Control Act, without having first obtained from the DDTC the required license or other written approval for such export.

| COUNT | DATE | ACT IN EXECUTION |
|---|---|---|
| 2 | July 29, 2016-August 26, 2016 | Export to Hong Kong one High-Power Advanced Laser-Aiming System from Las Vegas, Nevada |
| 3 | March 30, 2017 | Attempt to Export to Hong Kong one (1) AN/PRC-152 Handheld Radio and one (1) AN/PVS-31A Binocular Night Vision Goggles from Las Vegas, Nevada |

(**Unlawfully Exporting Arms and Munitions from the United States**, in violation of Title 22, United States Code, Section 2778(b) and (c); and Title 22, Code of Federal Regulations, Sections 121.1, 123.1, and 127.1).

## COUNT FOUR

24.    The Grand Jury re-alleges Paragraphs 1 through 21 of Count One of this Indictment as if fully set forth herein.

25.    Beginning in or around August 12, 2016, and continuing through in or around

September 20, 2016, within the District of Columbia and elsewhere, defendant **JOSEF**

**KOYSHMAN**, and others known and unknown to the Grand Jury, did willfully attempt to

export, and attempt to cause the export of, goods, technology and services, to wit, the Illinois

Company's G33 Magnifier, without having first obtained the required licenses or authorizations

from the Department of Commerce's Bureau of Industry and Security, located in the District of

Columbia.

> (**Attempted Unlawful Export**, in violation of Title 50, United States Code, Section 1705).

## FORFEITURE ALLEGATION

26.     Upon conviction of any of the offenses alleged in Counts One through Four, the

defendant shall forfeit to the United States any property, real or personal, which constitutes or is

derived from proceeds traceable to these offenses, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28

U.S.C. § 2461(c). The United States will also seek a forfeiture money judgment against the

defendant equal to the value of any property, real or personal, which constitutes or is derived

from proceeds traceable to this offense.

27.     If any of the property described above as being subject to forfeiture, as a result of

any act or omission of the defendant:

a.     cannot be located upon the exercise of due diligence;

b.     has been transferred or sold to, or deposited with, a third party;

c.     has been placed beyond the jurisdiction of the Court;

d.     has been substantially diminished in value; or

e.     has been commingled with other property that cannot be divided without
       difficulty;

the defendant shall forfeit to the United States any other property of the defendant, up to the

value of the property described above, pursuant to 21 U.S.C. § 853(p).

   (**Criminal Forfeiture,** pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 28, United Sates Code, Section 2461(c), and Title 21, United States Code, Section 853(p)).


A TRUE BILL


FOREPERSON

Attorney of the United States in
and for the District of Columbia

13